IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 26, 2021 Session

## JULIUS T. MALONE ET AL. v. ASF INTERMODAL LLC

**Appeal from the Circuit Court for Shelby County**
**No. CT-000503-16  Mary L. Wagner, Judge**

——————————————————

**No. W2020-00430-COA-R3-CV**

——————————————————

Appellant stipulated that its employee was the at-fault driver in a motor vehicle accident involving Appellee. Appellee and his wife filed suit against Appellant for personal injuries and the issue of damages was tried to a jury, which returned a verdict in favor of Appellees. Appellant appeals, arguing that the jury's award of damages for loss of earning capacity, future medical expenses, permanent injury, and loss of consortium is contrary to the law and evidence. Because there is material evidence to support the jury's verdict, we affirm the trial court's judgment on same.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

Sean W. Martin and Michael J. Petherick, Chattanooga, Tennessee, for the appellant, ASF Intermodal, LLC.

Eric J. Lewellyn and Thomas R. Greer, Memphis, Tennessee, for the appellees, Julius T. Malone and Margaret S. Malone.

### OPINION

### I. Background

On September 4, 2015, Irvin Taylor and Julius T. Malone were involved in an accident on I-240 in Memphis, Tennessee. Prior to trial, Appellant ASF Intermodal, LLC ("ASF") stipulated that its employee, Mr. Taylor, was the at-fault driver in the collision.

As the Malone and Taylor vehicles travelled westbound on I-240, Mr. Taylor attempted to merge his semi-truck into Mr. Malone's travel lane. As a result of merging his vehicle into that travel lane, the passenger's side of Mr. Taylor's truck collided with the driver's side of Mr. Malone's vehicle. The force of the collision caused Mr. Malone's vehicle to spin out of control and strike a pickup truck and a van travelling on I-240.

Sergeant Keith Boggan of the Memphis Police Department arrived at the scene of the collision shortly after it occurred. After Sergeant Boggan concluded his investigation, Mr. Malone drove himself home. After Mr. Malone returned home, his wife, Margaret (together the "Malones," or "Appellees"), insisted he be examined by a doctor. Mr. Malone presented at the emergency department at Saint Francis Hospital in Memphis, Tennessee, complaining of pain in his upper left leg. At that time, Mr. Malone was observed to be alert and oriented. Mr. Malone was released the same day with instructions to follow up with his physician if his symptoms did not abate. Five days after the accident, on September 9, 2015, Mr. Malone presented at Allied Clinic, complaining of left leg and back pain. He was seen by Erroll M. Taylor, M.D. Following his assessment, Dr. Taylor prescribed a course of physical therapy for Mr. Malone between September 9, 2015 and October 2, 2015.

After the accident, Mr. Malone also received a significant amount of treatment for peripheral artery disease ("PAD"). In his deposition testimony, Dr. Jorge Alvarez, M.D., an interventional cardiologist and witness for ASF, explained that

> peripheral vascular disease is, in general terms, just a blockage of the arteries of the vascular bed, whether it be in your legs, in your arms, in your neck or—and it is essentially a process in which a blockage tends to form and doesn't allow the blood flow to travel through there as easily; essentially like a dam.

Mr. Malone began receiving treatment for PAD in 2008—approximately seven years before the accident. As discussed in further detail below, Dr. Jorge Alvarez, an interventional cardiologist licensed in Texas, testified that, in 2008, the PAD primarily affected Mr. Malone's right leg. However, in March 2016, Mr. Malone underwent surgery at the Veterans Affairs Medical Center in Memphis to alleviate blockage in both of his legs. In January 2019, Mr. Malone began experiencing worsening pain and received a second surgery to address the blockage in his legs; this surgery was performed by Prateek Gupta, M.D., a vascular surgeon.

In addition to the foregoing treatments, on March 21, 2018, Mr. Malone was seen by Apurva Rashmikant Dalal, M.D., an orthopedist, for examination and assessment of lower back and leg pain he experienced after the September 4, 2015 collision. As discussed in detail below, Dr. Dalal concluded that Mr. Malone's leg pain radiated from injuries to his lower back, and not from his preexisting PAD. Dr. Dalal observed that Mr. Malone

- 2 -

suffered from a bulging disk and degenerative disk disease with acquired scoliosis and spinal stenosis. Based on the nature and timing of Mr. Malone's physical symptoms, Dr. Dalal concluded that his symptoms were caused by the September 4, 2015 collision. Dr. Dalal also opined that Mr. Malone would require future MRIs, medication as needed, and physical and occupational therapy as needed.

Mr. Malone also sought treatment from Bruce Rubin, M.D., and Ivelisse Raimundi, Psy. D. After conducting examinations of Mr. Malone and reviewing his medical records, Dr. Rubin and Dr. Raimundi concluded that Mr. Malone sustained a traumatic brain injury in the collision. As discussed in further detail below, ASF maintains that there was no evidence of a brain injury in the hours and days immediately following the accident. ASF contends that Mr. Malone did not, in fact, suffer a traumatic brain injury in the accident; rather, it contends that any cognitive changes that Mr. Malone experienced after the accident were the result of metabolic changes in the brain or normal aging.

On February 8, 2016, the Malones filed suit against Mr. Taylor and ASF for personal injuries resulting from the accident. Appellees asserted a negligence claim against Mr. Taylor and vicarious liability, negligent hiring, negligent training, and negligent supervision claims against ASF. Mr. Malone alleged damages including loss of earning capacity, future medical expenses, past and future pain and suffering, past and future loss of enjoyment of life, permanent injury, and property damage. Mrs. Malone sought damages for loss of consortium.

A jury trial was held from September 9, 2019, through September 17, 2019. After jury selection was completed, the trial court ruled that evidence of Mr. Taylor's prior criminal acts would be excluded from trial as irrelevant under Tennessee Rule of Evidence 403. As part of the court's reasoning, it stated, "We're not going to . . . have a jury allocating fault between the plaintiffs and the defendants. The defendants are going to be a hundred percent at fault for whatever damages might be proven." After the court's ruling, counsel for Appellees moved to non-suit Mr. Taylor and to proceed only against ASF. ASF did not raise any objection to the non-suit of Mr. Taylor and did not make any argument that he should remain as a defendant in the case. Rather, ASF's attorney made an oral motion for continuance, arguing that the non-suit of Mr. Taylor affected her trial preparation because she had planned to split trial duties with counsel for Mr. Taylor. Appellees' counsel opposed the motion. The trial court denied ASF's motion for continuance.

The parties agreed to the jury verdict form, with the exception of ASF's objection to the inclusion of a blank for property damage. The jury verdict form included two blanks for damages suffered by Margaret Malone, i.e., "Loss of Services of Julius Malone" and "Loss of Companionship and Acts of Love and Affection." ASF made no objection to the inclusion of either blank.

At the conclusion of the trial, the jury returned a verdict in favor of Appellees in the amount of $2,519,772. The award to Mr. Malone was comprised of the following amounts: (1) Loss of Earning Capacity $375,000; (2) Future Medical Expenses $400,000; (3) Past Pain and Suffering $100,000; (4) Future Pain and Suffering $575,000; (5) Permanent Injury $55,000; (6) Past Loss of Enjoyment of Life $175,000; (7) Future Loss of Enjoyment of Life $700,000; and (8) Property Damage $4,772. The award to Mrs. Malone was comprised of the following: (1) Loss of Services of Mr. Malone $60,000; and (2) Loss of Companionship and Acts of Love and Affection $75,000. Pursuant to Tennessee Code Annotated section 29-39-102, the trial court applied the cap on non-economic damages, reduced the verdict to $1,529,772, and entered its Judgment on the Jury Verdict on September 25, 2019

ASF filed a Motion for New Trial or, in the Alternative, for Remittitur arguing only that the jury's verdict was not supported by the law or evidence. By order of February 14, 2020, the trial court denied ASF's motion for new trial or remittitur. ASF appeals.

## II. Issues

ASF raises four issues for review as stated in its brief:

1. Whether the jury's verdict is contrary to the law and the weight of evidence presented at trial;
2. Whether the trial court erred in denying [ASF's] Motion for New Trial or, in the Alternative, a Remittitur;
3. Whether the trial court erred in denying [ASF's] oral motion to continue the trial; and
4. Whether the trial court erred in permitting a voluntary dismissal of the co-defendant at trial.

As noted above, ASF filed a Motion for New Trial or, in the Alternative, for Remittitur arguing only that the jury's verdict was not supported by the law or evidence. In its memorandum in support of the motion for new trial, ASF limited its argument to the evidence adduced at the trial and whether that evidence supports the jury's verdict. Tennessee Rule of Appellate Procedure 3(e) states in relevant part:

[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

- 4 -

Although raised as issues and arguments in its appellate brief, ASF's motion for new trial did not address: (1) the denial of ASF's motion for continuance; (2) the non-suit of Mr. Taylor; (3) the jury instructions; or (4) statements made by Appellees' counsel during opening statement or closing argument. Rather, the motion for new trial specifically states that "[t]he basis of [the] Motion[] [is]" that: (1) "The Verdict is contrary to the law"; and (2) "The Verdict is contrary to the evidence." Under Tennessee Rule of Appellate Procedure 3(e), ASF's appeal is limited to these two assignments of error and all other issues are waived. Therefore, the sole dispositive issue is: Whether the jury's verdict is contrary to the law or evidence. We will limit our analysis to that question.

## III. Standard of Review

In reviewing a jury verdict, this Court is "required to take 'the strongest legitimate view of all the evidence in favor of the verdict, assume the truth of all evidence that supports the verdict, allowing all reasonable inferences to sustain the verdict, and to discard all countervailing evidence.'" *Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 422 (Tenn. 2013) (quoting *Akers v. Prime Succession of Tenn., Inc.*, 387 S.W.3d 495, 501-02 (Tenn. 2012)); *see also Bell v. Roberts*, No. M2018-02126-COA-R3-CV, 2020 WL 3832995, at *2 (Tenn. Ct. App. July 8, 2020). An appellate court will not disturb a jury's verdict that is approved by the trial court if there is "any material evidence to support the award." *Ellis v. White Freightliner Corp.*, 603 S.W.2d 125, 129 (Tenn. 1980); *see also Holt v. Kirk*, No. W2017-00847-COA-R3-CV, 2019 WL 1915158, at *6 (Tenn. Ct. App. Apr. 30, 2019) ("On appeal, our task is limited to a review of the record to determine if the jury verdict is supported by any material evidence."). "Material evidence" is "'evidence material to the question in controversy, which must necessarily enter into the consideration of the controversy and by itself, or in connection with the other evidence, be determinative of the case.'" *Meals*, 417 S.W.3d at 422 (quoting *Knoxville Traction Co. v. Brown*, 89 S.W. 319, 321 (Tenn. 1905)). "'It matters not a whit where the weight or preponderance of the evidence lies under a material evidence review.'" *Id.* at 423 (quoting *Hohenberg Bros. Co. v. Mo. Pac. R.R. Co.*, 586 S.W.2d 117, 119-20 (Tenn. Ct. App. 1979)). As the *Meals* Court explained, "the material evidence standard lies at the foundation of the right to trial by jury." *Id.* (citing TENN. CONST. art. I, § 6; *Truan v. Smith*, 578 S.W.2d 73, 74 (Tenn. 1979)). As a result, we are required to affirm a jury verdict "if there is material evidence to support [it]." *Id.*

Furthermore, "[w]here, in a motion for new trial, the judge simply approves the jury's verdict without further comment, the appellate court presumes that the trial judge adequately performed his [or her] function as thirteenth juror." *Davidson v. Lindsey*, 104 S.W.3d 483, 488 (Tenn. 2003); *see also Miller v. Doe*, 873 S.W.2d 346, 347 (Tenn. Ct. App. 1993) ("If called upon to act as a thirteenth juror following the filing of a motion for a new trial, the trial judge simply approves a verdict without any comment, it is presumed by an appellate court that [she or] he has performed his [or her] function adequately.").

## IV. Analysis

The Malones' personal injury case sounds in negligence. To establish a valid claim for negligence, a plaintiff must offer proof of the following: (1) the defendant owed a duty of care to the plaintiff; (2) the defendant's conduct fell below the applicable standard of care, amounting to a breach of the duty owed; (3) an injury or loss stemmed from the breach of the duty owed; (4) cause in fact; and (5) proximate cause. ***King v. Anderson Cnty.***, 419 S.W.3d 232, 246 (Tenn. 2013). "No claim for negligence can succeed in the absence of any one of these elements." ***Kilpatrick v. Bryant***, 868 S.W.2d 594, 598 (Tenn. 1993). As noted above, prior to trial, ASF stipulated that its employee, Mr. Taylor, was the at-fault driver in the accident; accordingly, the first two prima facie elements of negligence, i.e., duty and breach of that duty, were satisfied. The remaining elements were tried to the jury.

### A. Proof Concerning the Cause of Mr. Malone's Injuries

At trial, the Malones asserted that Mr. Malone's back and leg pain, as well as his cognitive impairments, were caused by injuries he sustained in the accident. ASF maintained that Mr. Malone's back and leg symptoms were the result of the progression of his PAD and, thus, were not caused by the accident. As to Mr. Malone's alleged brain injury, ASF argued that there was no evidence of brain injury in the days immediately following the accident; based on the timing of Mr. Malone's cognitive symptoms, ASF asserted that these injuries did not stem from the accident. The jury heard evidence that Mr. Malone suffers from pain in his legs and back that affect his mobility and ability to work. The jury also heard evidence concerning certain cognitive issues that affect Mr. Malone's memory, personality, and emotions. The jury returned a verdict in favor of the Malones. Because our appellate review is limited to the question whether there is material evidence to support the jury's verdict, we turn to review the evidence adduced at the trial on the question of the cause of Mr. Malone's alleged injuries.

### 1. Lay Witness Testimony Concerning Mr. Malone's Injuries

The Malones first called two of their friends, Eric Jimmerson and Theresa Marshall, and their daughter, Ebony Malone, to testify. Each of these lay witnesses provided testimony concerning the impact of the accident on Mr. Malone's activities, behavior, and relationships.

Mr. Jimmerson testified, in relevant part, as follows:

Q. Did you ever see [Mr. Malone] hobbling around with a cane or not able
to stand up or anything like that?
A. Yes, since the wreck.
Q. Before the wreck.
A. Oh, no.

- 6 -

Q. What kind of personality did Mr. Malone have before this wreck?
A. He was an outgoing person before the wreck.
Q. Did you see a difference—have you seen a difference in Mr. Malone after the wreck?
A. Yeah.
Q. Will you tell the jury how?
A. An attitude change. He snaps, cries. You know, he can't do maintenance work around his house or nothing like that now.

***

Q. Okay. Was he like that before?
A. No.
Q. Did you ever see him cry before the wreck?
A. No.
Q. What kind of stuff does he cry about?
A. Man, he will cry about anything now.
Q. Before the wreck did he work?
A. Yeah, every day.
Q. Was he fun to be around before the wreck?
A. Yeah.
Q. How about now?
A. Sometimes.
Q. Now, do you also have to go out and help out at the house?
A. Yeah. I do maintenance work, and I do the yardwork around there for them.
Q. When did that start?
A.  After the wreck.

Likewise, Ms. Marshall testified:

Q. Before the wreck will you describe Mr. Malone's personality?
A. Yeah. He was I'll just say the life of the party. He was very talkative, outgoing.  Most of the time he worked a lot. So, if he was off work, he liked to relax with the family and enjoy himself.
Q.  . . . [B]efore the wreck was he the kind of guy to lay around the house and . . . do nothing?
A. Not at all, no.
Q. Did you know about any—did you witness any physical injuries, him not being able to stand up a lot or having problems or having any kind of physical problems before the wreck?

A. Not before, no.

Q. Did you witness some after?

A. Yes, definitely.

Q. How would you describe—how has he been personality-wise since the wreck?

A. I don't see him out as much. When I do see him, I have to go to their house. And before then he was the kind that would come to you. As far as seeing him, he's always in his bedroom. And he walks with a cane. And I'm not used to seeing him like that because most of the time, when you see [Mr. Malone], he's going to work or coming from work. And, like I said, he's the life of the party. So just to see him not moving is totally different.

Ms. Marshall also testified to Mr. Malone's behavior on a car trip she took with the Malones sometime after the accident, to-wit:

A. We went to Atlanta, Georgia. [The Malones] had some family business that they needed to take care of, and [Mrs. Malone] asked me would I go and help drive.

Q. Did you have a good time on that drive . . .

A. No.

Q. Tell the jury what happened.

A. [Mr. Malone] sat in the back seat, and I didn't realize how traumatized he was after the accident. [Mrs. Malone] had told me, but I didn't realize that it was that severe. The whole time he was hollering and screaming and telling me do you see that car, do you see that truck? Move over. Wait. Slow down. Stop. . . .

Finally, the Malones' adult daughter, Ebony Malone, testified, in pertinent part, as follows:

Q. Tell the jury about your dad before the wreck, what kind of person he was.

A. My dad always had, like, two or three jobs. He's always worked. . . .

\*\*\*

Q Okay. Before this wreck happened in 2015, did he ever have any issues with low back pain?

A. No. He's—he's worked. He's always worked, like, two or three jobs, so it wasn't back—you know, not too many problems, you know, from work, probably aches and pains a little bit from work, but, no, he's never had back problems, no, sir.

\*\*\*

Q What do you remember your dad complaining about right after the wreck physically that was hurting on him?

A. Well, mainly his—his back. That was the biggest thing I seen. Because, like, after that we used to have to try to help him out a lot.

***

Q Since the wreck has—to your knowledge, has his back pain ever gone away?

A. No. It's got worse. Like, my dad can't—like I said, we have to help him, mainly my son, you know, he's bigger and stronger, so mainly my son, but my dad's not able to walk, you know, and he—when he showers, he has to sit down and shower. He's not able to stand up because he has, you know, pain. He's not able to do the things that he used to do.

Ebony Malone also testified to changes in her father's personality following the accident, to-wit:

Q. After the wreck, did there come a point in time when you started noticing that maybe something was just not right with him?

A. Yes.

Q. Mentally, personality-wise?

A. Yes, sir.

Q. Okay.

A. Like I said, my dad has always been strong. Always. But I started seeing it go downhill. My dad's not an emotional person, so when—I would see times he would get emotional. He would get forgetful. He can't remember certain things.

Q. Give us an example.

A. Like things that he will ask about that he's—he did it himself when we know I haven't touched it, the kids haven't touched it, my mom hasn't touched it, and I know—we know that he's touched it, but he's misplaced it. He doesn't—he doesn't know. He doesn't remember. And then when he do—finally do remember it, he gets a little frustrated because he couldn't. He's always been able to do things for himself, and him not being able to do things, you know, for himself it really was messing him up.

Q. Was he a proud, independent kind of guy before?

A. Very. Very proud, yes, sir.

Q. Was he a complainer before?

A. No. No, no, no.

Q. What about since the wreck?

A. He's very needy. He—he doesn't like help because he's always been that

- 9 -

type of person that was the provider that does stuff for us. So by him just having to ask somebody . . . to help him do anything, it's frustrating. . . .

Q. The things that you mentioned about forgetfulness, being tearful, those kind of personality changes, when did you first start noticing them after the wreck?

A. I know briefly right after the wreck. Like weeks after, you know, it started, like, going downhill. It just got real hard to see him like that. I've never seen him like that, . . . but it got very hard to see him in that type way.

In some instances, causation can be established by lay testimony when a "simple" injury such as a cut or abrasion is involved.  *See Varner v. Perryman*, 969 S.W.2d 410, 412 (Tenn. Ct. App. 1997) (citation omitted).  However, "[m]edical causation and permanency of an injury must be established in most cases by expert medical testimony." *Thomas v. Aetna Life & Cas. Co.*, 812 S.W.2d 278, 283 (Tenn. 1991) (citations omitted). In addition to the foregoing lay testimony, the Malones offered testimony from Mr. Malone's treating physicians and other medical experts.  We now turn to review that testimony.

## 2.  Medical Expert Testimony
## Regarding Mr. Malone's Back and Leg Injuries

The Malones' medical proof began with the testimony of Dr. Dalal, a board-certified orthopedic surgeon, who examined Mr. Malone after the accident.  Dr. Dalal testified as to his initial perception on meeting Mr. Malone:

Now, he is very emotional. He suffers from anxiety. He is constantly scared. He is walking with a cane. He is complaining of loss of memory, loss of orientation, mental disturbance.  He explains to me he has constant pain in his lower back, which radiates down . . . the left leg [].  And he suffers from nightmare and he has trouble sleeping. He especially is afraid of traveling in a vehicle.

Concerning Mr. Malone's specific complaints, Dr, Dalal testified, in relevant part, as follows:

A.  So in this particular case [Mr. Malone] had lower back pain and a pain radiating down to the left leg, yes.

Q. How are those two things related?

A. Well, they're related because the back condition is causing pressure on the nerve making this leg [] hurt.

Q. So would it be accurate to say that a lower back injury can cause pain to radiate down the leg?

A. The fact is, the low back, when it is bad can cause pressure on the nerve in the spine and cause pain radiating down the leg. So that is a known medical fact.

Q. On March 21, 2018, when Mr. Malone came to see you, did he also report that he was having headaches?

A. Yes.

Q. Did he say how frequently those where occurring?

A. Well, he said they were very frequent. He also had memory loss and loss of orientation and mental disturbance.

Q. What do you mean by loss or orientation and mental disturbance?

A. He says he used to basically forget where he was and what was the day and things of that nature.

Q. Did he tell you how long he had been having those problems?

A. Since the accident.

Q. The accident of September?

A. Right. Since the collision where the 18-wheeler hit his vehicle on 9/4/2015.

Based on his review of Mr. Malone's medical records and his physical examination of Mr. Malone, Dr. Dalal ultimately opined that Mr. Malone's leg pain was attributable to injury to his lower back and radiculopathy, i.e., nerve pain radiating from the lower back injury into his leg, to-wit:

A. Now, review of medical records was performed, which shows basically I have looked at the MRI of the lumbar spine, which was done on November 13, 2015, which shows the patient suffers [from] multilevel degenerative disc disease with acquired scoliosis and spinal stenosis. He has got a bulging disc.

***

Q. Based on the MRI can you say more likely than not that Mr. Malone's left leg pain is caused by this disc bulge at L5[]?

A. I can.

Dr. Dalal further opined that Mr. Malone's injuries were caused by the accident as opposed to his pre-existing PAD:

Q. And I know we talked more generally earlier, but is a disc herniation or extrusion at L4-L5 something that can be caused by trauma?

A. Yes.

- 11 -

Q. And in Mr. Malone's case specifically do you believe that extrusion at L4, L5 was caused by the wreck in September of 2015?
A. Yes.
Q. Why do you reach that conclusion?
A. Well, truly speaking I reached the conclusion based on the patient's history. He explains to me that his left leg pain started after the collision. Before that he did not have these kinds of problems. Now, I see that after the collision in an MRI, which was taken subsequently shows a disc protrusion with an extrusion on the left side at L4-S1. Now, so in my opinion this MRI, which is an objective evaluation matches exactly with his clinical presentation.

To counter Dr. Dalal's testimony concerning the cause of Mr. Malone's leg pain, ASF elicited testimony from Dr. Jorge Alvarez, Dr. Prateek Gupta, and Dr. James Varner.

Dr. Alvarez reviewed Mr. Malone's medical records but did not physically exam Mr. Malone. In reviewing Mr. Malone's medical records both before and after the accident, Dr. Alvarez noted that Mr. Malone was diagnosed with PAD in 2008, at which time Mr. Malone "had significant vascular disease on his **right** leg, [but his] **left** leg . . . was actually pretty normal." However, Dr. Alvarez went on to testify that "in 2015 it appears that [Mr. Malone's] ABIs in both legs were significantly decreased,[1] which showed [] some progression of his peripheral vascular disease from a normal left leg to an abnormal left leg." This fact led Dr. Alvarez to conclude as follows:

Q. Doctor, based upon your review of the medical records . . . do you have an opinion regarding the cause of Mr. Malone's peripheral vascular disease?
A. So my opinion, based upon the cause, is that in 2008 Mr. Malone had significant vascular disease on the right leg, and with an extra five, six years of not getting it under control, he just had progression of the natural history of peripheral vascular disease.
Q. And Doctor, is that opinion based upon a reasonable degree of medical certainty?
A. Yes, ma'am.

ASF also called Dr. Prateek Gupta, M.D., a vascular surgeon, to testify about Mr. Malone's treatment for PAD and the progression of the disease. Dr. Gupta first saw Mr. Malone in January 2019 for pain Mr. Malone was experiencing in his left leg. Tests revealed that the blockage in Mr. Malone's left leg was severe, and Dr. Gupta performed a

---

[1] Dr. Alvarez explained that, "an ABI test [] is an abbreviation for an ankle brachial index, which is a screening test that is used frequently for patients that have symptoms or suspected of having symptoms of vascular disease."

surgery in late January 2019 to relieve the blockage. Concerning the need for another surgery, Dr. Gupta testified:

Q. Now, Doctor, you, uh -- we discussed earlier that [] several years back, [], that Mr. Malone had a [] surgery for peripheral vascular disease. [A]nd then, you saw him in January of 2019. Is that a common or an uncommon presentation in terms of having one surgery and then, having to have it done again a few years later?
A Uh, it's fairly common.
Q Okay. And why is that?
A Uh, [PAD] disease is chronic in nature. The treatments usually don't last patient's lifetime. So these bypasses last a few years. When they stop working, patients have the same problems and need repeat interventions.

Dr. Gupta further testified that PAD could cause difficulty with walking because of insufficient blood flow to the muscles of the legs.  On follow-up in February 2019, Dr. Gupta noted that Mr. Malone's "left foot pain was a lot better, and as expected a month out from surgery."

On cross-examination, Dr. Gupta testified that, in view of Mr. Malone's pre-existing PAD, he did not explore the possibility that the left leg pain originated in Mr. Malone's back:

Q. [I]n your evaluation and assessment of Mr. Malone, did you perform any evaluation of his lower back?
A No.
Q. In doing [] a differential diagnosis to arrive at . . . your ultimate diagnosis in this case, did you have to rule out lumbar radiculopathy from a disk herniation?
A Uh, we didn't specifically look at any of that, because his symptoms were very classic for peripheral arterial disease.
Q Okay. So . . . in order to arrive at the diagnosis of peripheral arterial disease, you didn't have to rule out lumbar radiculopathy?
A No.

***

Q. Okay. Uh, peripheral arterial disease, can that be caused by trauma to a limb?
A. It can be, but that's more like an acute presentation. Uh, it's—it's more commonly a disease, a chronic disease.
Q. Okay. In people who have suffered trauma to a limb. . . can they develop peripheral arterial disease as a result of that trauma?

- 13 -

A. Occasionally, yes.
Q. And can that cause long-term circulatory problems for the person?
A. Possibly.

\*\*\*

Q. Uh, if someone had a pre-existing history of peripheral arterial disease and suffered a trauma to their limb, could that trauma cause acute on chronic problems with peripheral arterial disease?
A. It can, yes.
Q. Okay. . . would another way of saying that be that trauma . . . can make [] pre-existing peripheral arterial disease worse?
A. Yes.

On re-direct, Dr. Gupta stated his opinion that trauma was not the cause of Mr. Malone's PAD; however, Dr. Gupta did not change his previous statement that trauma "can make [] pre-existing peripheral arterial disease worse." From Dr. Gupta's testimony, and in view of the fact that Mr. Malone underwent his first PAD surgery in March of 2016—within approximately six months of the accident—a reasonable jury could have concluded that Mr. Malone's existing PAD was exacerbated by the accident.

Dr. James Varner, an orthopedic surgeon, reviewed Mr. Malone's medical records, but did not perform a physical examination. Concerning the November 13, 2015 MRI of Mr. Malone's lumbar spine, Dr. Varner testified as follows:

Q Okay. And, Doctor, given the fact that this motor vehicle accident occurred in September of 2015 and the MRI was done in November of 2015, what significance, if any, does that have in terms of the causation of any of the stenosis or the degenerative disc disease?
A. Well, the MRI obviously was done two months following the accident. He wouldn't have had development of degenerative changes and bone spurs and things in that short time interval. So those changes, in my opinion, were as a result of the degenerative process.
Q. Okay. And, Doctor, you also mentioned that there was a small disc—or a small protrusion, and—do you have any opinion about whether or not that was degenerative in nature from the aging process or if some finding like that could be from a motor vehicle accident?
A. Again, I think that the jury would understand [that] it's impossible sometimes to look at an MRI after an accident and tell you what was there before the accident and what might be different following the accident. . . . Again, the findings that were exhibited on the MRI, in November of 2015, certainly could be exclusively as a result of the aging and degenerative process. Could a small disc protrusion as evidenced here between L4 and L5

- 14 -

be as a result of an accident? Yes, that's the case also.

Importantly, Dr. Varner did not definitively state, to a reasonable degree of medical certainty, that Mr. Malone's leg pain was not caused by the accident; as set out in context above, he clearly states that the injury could be either "a result of aging and degenerative process," or could be "a result of an accident." Conversely, the Malones' expert, Dr. Dalal, adamantly maintained that Mr. Malone's injuries were the result of his accident:

Q. Defendants hired an expert in this case, Dr. Varner, who has said that without a prior MRI of his lumbar spine before the wreck that essentially we can't know whether or not this disc injury was caused by the wreck. Do you agree or disagree with that?
A. I completely disagree with Dr. Varner.
Q. And why is that?
A. Because as I said, nobody drives around with an MRI every day thinking that somebody is going to come and hit you so that you can compare whether your problem was before the accident or after the accident, you know. The whole fact of the matter is in this particular case Mr. Malone believing that his history to be true and honest, a man who used to go every single day to work or he went to work and he did whatever he did, gets into a car accident, now starts having leg pain. You have an objective analysis that he's got a herniated disc on the side where he has leg pain and it anatomically is identical—where you expect [radiculopathy from] that disc. . . .  And there is no reason to disagree to the fact just because he doesn't have a previous MRI. He did not choose to have back pain prior to a collision to go run for an MRI test. So I completely disagree with Dr. Varner. I think my opinion is very straight and clear. He had a Collision, he had back pain. His MRI shows the herniated disc. He has radiculopathy. And these are all completely collaborated with each other.

Likewise, Dr. Bruce Rubin, a board-certified neurologist licensed in Florida and New York, who first saw Mr. Malone on July 26, 2017, offered his opinion that Mr. Malone's back and leg pain were caused by the accident and not the pre-existing PAD, to-wit:

Q. Okay. What about the back pain and left leg pain that Mr. Malone was complaining of?  Were you able to determine whether or not that was related to the September 4, 2015 collision?
A. It seemed to be. It occurred directly right after the injury at the time of the injury. It's been there since that time.
Q. Okay. And what's the significance of the fact that Mr. Malone continued to suffer from that left leg pain even after he had this surgery to treat his Peripheral Vascular Disease?

- 15 -

A. Probably the Peripheral Vascular Disease was not causative of the pain.
Q. Okay. Is that one of the factors that makes you believe that the wreck caused the left leg pain and the lower back pain?
A. Correct.

It is well settled that, in order to be competent, medical testimony must be predicated on something more than the possibility of a proposition, and "[t]estimony which amounts to mere speculation is not evidence which establishes proximate cause." ***Primm v. Wickes Lumber Co.***, 845 S.W.2d 768, 771 (Tenn. Ct. App. 1992) (citations omitted). As the Tennessee Supreme Court has previously noted: "The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough[.]" ***Lindsey v. Miami Dev. Corp.***, 689 S.W.2d 856, 861 (Tenn. 1985) (citation omitted). That being said, "[r]econciling apparently conflicting testimony and evaluating the witnesses' credibility are, in the first instance, the jury's responsibilities." ***Grissom v. Metropolitan Government of Nashville, Davidson County***, 817 S.W.2d 679, 683 (Tenn. Ct. App. 1991); *see also **White v. Seier***, 264 S.W.2d 241, 243 (Tenn. Ct. App. 1953) (refusing to set aside the jury's liability determination in a tort action based on conflicting evidence). In short, although there was conflicting medical testimony concerning whether Mr. Malone's back and leg injuries were caused by the accident, the jury was free to believe one witness and disbelieve another. See ***Ferguson v. Middle Tennessee State University***, 451 S.W.3d 375, 383 (Tenn. 2014) ("The jury can disregard the testimony of a witness it does not find to be credible."). As such, the jury had autonomy to disregard the testimonies of ASF's experts and to rely on the testimony of Dr. Dalal and Dr. Rubin. Dr. Dalal's and Dr. Rubin's testimony provides ample material evidence on which the jury could have concluded that Mr. Malone's back and leg injuries were caused by the accident.

## 2. Medical Expert Testimony Regarding Mr. Malone's Brain Injury

The Malones also relied on Dr. Rubin for evidence concerning Mr. Malone's brain injuries. Dr. Rubin first saw Mr. Malone on July 26, 2017. At that time, Mr. Malone "was complaining of some short-term memory difficulties, depression, anxiety, lower back pain, [and] left leg pain." Dr. Rubin took a medical history from Mr. Malone, and testified that immediately following the accident, Mr. Malone's "main issues were pain related to his back and leg." However, "over time[, Mr. Malone] was more aware of issues with short-term memory, losing things, forgetting things. There were mood changes noted by his family. He also had some headaches [with] sleep difficulties." When asked whether these "sorts of complaints [are] consistent with a traumatic brain injury," Dr. Rubin answered: "Typical, yes." Based on Mr. Malone's medical history, Dr. Rubin testified that Mr. Malone's "mental symptoms, the memory loss, the mood changes, the anxiety, depression" were not present prior to the accident. Dr. Rubin's ultimate diagnosis was as follows:

Q. Based on the history that Mr. Malone presented with and the records that you reviewed in your examination of him, did you reach any conclusions about what his problems were?

A. I thought his history and complaints were consistent with mild traumatic brain injury likely due to trauma from the accident. He had some post traumatic back pain or leg pain.

Q. And let's start with the traumatic brain injury. . . . [H]ow was it that you came to link the symptoms that Mr. Malone was having mentally to the wreck?

A. The [] constellation of symptoms [is] fairly frequent in traumatic brain injury. Those complaints of short-term memory problems, anxiety, depression, sleep difficulty, headaches, [] it's sort of almost pathognomonic for concussion and post-concussion symptoms given the accident, the loss of consciousness. I think those are just other factors that help support that diagnosis.

Throughout the proceedings, ASF elicited testimony that: (1) Mr. Malone did not lose consciousness in the accident; (2) Mr. Malone did not complain of headache when he was seen at the Saint Francis emergency department (or subsequently at Allied Clinic); and (3) Mr. Malone's medical records do not indicate any evidence of cognitive impairment at or near the time of the accident.

Concerning the absence of evidence that Mr. Malone lost consciousness in the accident, Dr. Rubin explained:

Q. Okay. There's been some discussion in the case about whether or not Mr. Malone reported the loss of consciousness to the ER when he went that day. What is the significance of that, if any, to you?

A. For me it's not significant at all. For you guys and lay people, I think it is. It just further demonstrates more severe type of injury such that the patients would lose consciousness. But, in fact, it's not the loss of consciousness that's . . . the problem. It's the trauma that's the problem. And if it manifests with a loss of consciousness, then there's a loss of consciousness. If it doesn't, it—most people when they have severe enough trauma, have some mild symptoms . . . of their brain not functioning correctly. That could be as minimal as being, quote, unquote, "dazed, confused, seeing stars, being momentarily confused," all those would qualify as a concussion. All that is a momentary issue with the brain not functioning normally. And regarding loss of consciousness, they can be very brief. Even with professionals looking on, viewing the symptoms, you often don't get corroboration on whether or not there's a loss of consciousness. So to me [loss of consciousness is] indifferent—I'm indifferent. It doesn't make a difference.

In reviewing the records of Mr. Malone's treatment at the Saint Francis emergency department, Dr. Varner noted that "[t]here was no evidence of a neurological deficit." However, having reviewed the same records, Dr. Rubin testified:

> Q. Okay. I'd like to hand you the records from St. Francis where Mr. Malone [was] treated on the date of the wreck. And if I could refer you to Page 14.
> A. Yes.
> Q. Under Medical Decision Making towards the bottom there and next to Differential Diagnosis, does the record indicate: "Motor vehicle collision, abrasion, confusion, sprain"?
> A. Yes.
> Q. And what's the significance of the fact that confusion is included in the differential diagnosis?
> A. Well, again, it's just an objective conclusion by medical personnel that the patient was not thinking clearly.
> Q. Okay. If [] Mr. Malone had not been confused or appeared confused to the professionals at the ER, would the word "confusion" appear in the differential diagnosis part?
>
> ***
>
> A. I would assume not.

Concerning his review of Mr. Malone's medical records from Allied Clinic, Dr. Rubin testified as follows:

> Q. I'd like to hand you another document. These are the records from Allied Clinic where Mr. Malone [was] treated shortly after the wreck. On the first page of the medical narrative. . . . Under History of Present Illness, does it indicate that Mr. Malone claimed a loss of consciousness?
>
> ***
>
> A. Yes, it does.
> Q. Okay. So based on this record, does it appear that Mr. Malone told his treating doctor [i.e., Dr. Thomas] that he lost consciousness on September 9 2015?
> A. Yes.

Dr. Rubin further testified:

> Q. The type of traumatic brain injury that . . . you diagnosed Mr. Malone with

- 18 -

that day, is that consistent with a motor vehicle collision?

A. Yes.

Q. Is that kind of trauma the thing that frequently can cause traumatic brain injuries?

A. Yes.

In addition to Dr. Rubin's testimony, the Malones also elicited testimony from Dr. Raimundi, a neuropsychologist who performs "assessment[s] of cognitive function after an individual suffers any type of trauma to the brain, either acquired or progressive." Dr. Raimundi examined Mr. Malone over three days in July 2018. Dr. Raimundi's initial observations were that

> he was . . . very emotional, and I even mention in my behavioral observations that he became tearful when reporting a lot of the changes after this injury. He reported mood ups and downs, tearfulness, irritability, prone to anger, low frustration tolerance, isolation, withdrawal, feelings of rejection, issues with memory. He was more forgetful and absentminded. He even developed a little bit of paranoia, the need to check and double-check his front door and other items around the house to see if they were closed properly or the stove was off, just to mention a few. He was having nightmares regarding the accident that I mention also in the document in the summary section; that he was having balance issues, word-finding issues, headaches, anxiety, depression, panic attacks.

The foregoing symptoms and complaints were largely corroborated by lay testimony from Mr. Malone's family and friends, *see supra*. From a medical standpoint, Dr. Raimundi testified that:

> Q. In that constellation of symptoms that you just described, are those consistent with what you might expect from a traumatic brain injury?
> A. Most definitely, yes.

***

> Well, my conclusions were that . . . there were some areas of specific changes after this injury, not only cognitively, but emotionally; that they were drastic and severe in taking that accident as the trigger. So the diagnostic impressions were Mild Neurocognitive Disorder due to the concussion suffered with behavioral disturbances. Mild Neurocognitive Disorder, again, because we were able to see some areas that remained intact within the average range and some areas that were significantly impaired. And the clarification with behavioral disturbance was an important one because we were able to see a lot of personality changes or mood changes, including

- 19 -

paranoia, excessive compulsion, feelings of depression, isolation, decreased libido, withdrawal, crying, irritability, low frustration tolerance, anger. And, of course, another area that I wanted to make clear here was his Major Depressive Disorder Moderate; that it was very difficult for him to verbalize and to express . . . that with clarity. However, when specific questions were asked, he was able to identify those. So a Major Depressive Disorder Moderate with mixed features was also diagnosed.

Dr. Raimundi's conclusions largely corroborated those of Dr. Rubin. From the totality of Mr. Malone's symptoms and the timing of the onset of those symptoms, Dr. Raimundi, like Dr. Rubin, opined to a reasonable degree of medical certainty that Mr. Malone's cognitive injuries were the result of brain trauma he suffered in the accident. As Dr. Raimundi concluded:

Q. Can you say to a reasonable degree of medical certainty that Mr. Malone suffered a concussion or traumatic brain injury in the September 4, 2015 collision?
A. Yes.
Q. The same question for the depression. Can you link his depression to that collision also to a reasonable degree of medical certainty?
A. Yes.

To counter Dr. Raimundi's and Dr. Rubin's testimony, ASF introduced the testimony of L. Keith Adkins, Ph.D., a neuropsychologist at Semmes-Murphey Clinic in Memphis. Although Dr. Adkins agreed that the tests performed on Mr. Malone by Dr. Raimundi were properly administered, he disagreed with Dr. Raimundi's interpretation of the results of those tests. Based on his review of Mr. Malone's test results, Dr. Adkins opined that the majority of the tests were normal, indicating normal brain function and no evidence of brain trauma. Likewise, ASF's expert, Dr. Alfred Callahan, a neurologist, opined that Mr. Malone did not suffer any brain injury in the collision. Although ASF offered evidence to dispute Dr. Rubin's and Dr. Raimundi's testimony, as noted above, the reconciliation of conflicting testimony and evaluation of witness credibility are the purview of the jury. *Grissom*, 817 S.W.2d at 683. Dr. Raimundi's and Dr. Rubin's respective testimony provides sufficient material evidence from which a reasonable jury could conclude that Mr. Malone's cognitive symptoms were caused by a traumatic brain injury he suffered in the collision.

## B. Damages

Having determined that there is material evidence to support the jury's verdict that Mr. Malone's back and leg injuries, as well as his cognitive injuries, were caused by the accident, we now turn to address the question of damages. In personal injury cases, calculation of damages is within the province of the jury. *See Lunn v. Ealy*, 141 S.W.2d

893, 894 (Tenn. 1940). "Damages may never be based on mere conjecture or speculation. . . . However, uncertain or speculative damages are prohibited only when the existence, not the amount, of damages is uncertain . . . Evidence required to support a claim for damages need only prove the amount of damages with reasonable certainty." ***Overstreet v. Shoney's Inc.***, 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999). As recently explained by this Court:

> The responsibility for resolving issues related to the assessment of damages is entrusted to the jury. ***Meals***, 417 S.W.3d at 419 (citing TENN. CONST. art. I, § 6). The award of damages is meant to compensate the plaintiff for damage caused by the defendant's wrongful conduct, making the plaintiff whole. ***Id***. (citing ***Inland Container Corp. v. March***, 529 S.W.2d 43, 44 (Tenn. 1975)). "The plaintiff bears the burden of proving damages to such a degree that, while perhaps not mathematically precise, will allow the jury to make a reasoned assessment of the plaintiff's injury and loss." ***Id***. (citing ***Overstreet***[,] 4 S.W.3d [at 703)]. A plaintiff is entitled to recover both economic and noneconomic damages. ***Id***. While economic damages cover losses such a medical expenses and lost wages, "'[n]on-economic damages include pain and suffering, permanent impairment and/or disfigurement, and loss of enjoyment of life.'" ***Id***. at 419–20 (quoting ***Elliott v. Cobb***, 320 S.W.3d 246, 248 n.1 (Tenn. 2010)). The assessment of noneconomic damages is "left to the sound discretion of the trier of fact," ***Overstreet***, 4 S.W.3d at 703, with the trial court serving as "an important check" on the jury's discretion by serving as thirteenth juror:
>
> > As thirteenth juror, the trial judge must independently weigh and review the evidence presented at trial to determine whether it preponderates in favor of the verdict and decide whether he or she agrees with and is satisfied with the jury's verdict. See ***State v. Moats***, 906 S.W.2d 431, 433 (Tenn. 1995). No verdict is valid unless approved by the trial judge acting as the thirteenth juror. *See id*. at 434; ***Shivers v. Ramsey***, 937 S.W.2d 945, 947 (Tenn. Ct. App. 1996).
>
> ***Meals***, 417 S.W.3d at 420. . . . [I]n addition to the remedy of granting a new trial, a trial court may cure an excessive verdict through the process of remittitur. ***Id***. (citing Tenn. Code Ann. § 20-10-102(a) (allowing for the trial court to suggest a remittitur following a civil jury trial)). "[R]emittiturs were designed to correct the excessiveness or inadequacy of a jury's verdict as an alternative to the granting of a new trial." ***Foster v. Amcon Int'l, Inc.***, 621 S.W.2d 142, 148 (Tenn. 1981).
> As an appellate court, our discretion to grant a remittitur is far more circumscribed than the trial court. "Where the trial judge has approved the

verdict in its role as thirteenth juror . . . the Court of Appeals' review of the verdict and its ability to suggest a remittitur is limited to a review of the record to determine whether the verdict is supported by material evidence." ***Meals***, 417 S.W.3d at 422 (citing ***Poole v. Kroger Co.***, 604 S.W.2d 52, 54 (Tenn. 1980)).

***Wortham v. Kroger Limited Partnership I***, No. W2019-00496-COA-R3-CV, 2020 WL 4037649, at *24-25 (Tenn. Ct. App. July 16, 2020).

On appeal, ASF summarizes its argument concerning damages as follows:

[T]he jury's awards of damages for permanent impairment and future medical expenses are unsupported by adequate medical expert testimony, are only supported by speculation and legally inadequate lay testimony, and are therefore contrary to Tennessee law. Moreover, the amount of non-economic damages awarded to Plaintiffs exceeds the range of reasonableness based on the evidence presented at trial and more likely results from passion or prejudice created by Plaintiffs' consistent attempts to distract the jury from the sole issue at trial—damages. Even if the trial court did not err in refusing to suggest a reduction of the damages awarded to Plaintiffs, it should have at least granted a new trial to cure the prejudice caused by a jury that was impassioned and distracted by Plaintiffs' repeated, prejudicial accusations about Defendant's acts of alleged misconduct.

From the foregoing statement, we glean that ASF's argument concerning damages is two-fold. First, ASF argues that the evidence is insufficient to establish that Mr. Malone's injuries constitute permanent impairment; thus, ASF contends that the jury's award of damages for permanent injuries, future medical expenses, and loss of earning capacity was error. ASF also contends that the jury award "exceeds the range of reasonableness" and was the result of the jury's passion and prejudice, thus requiring reversal.

### 1. Permanent Injury

The jury awarded $55,000 for permanent injury. As explained by the ***Overstreet*** Court,

[a] permanent injury . . . is an injury from which the plaintiff cannot completely recover. *See* ***Jordan v. Bero***, 158 W.Va. 28, 210 S.E.2d 618, 630 (1974). It prevents a person from living his or her life in comfort by adding inconvenience or loss of physical vigor. *See* ***Wheeler v. Bennett***, 312 Ark. 411, 849 S.W.2d 952, 955 (1993). . . . Permanent injury may relate to earning capacity, pain, impairment of physical function or loss of the use of a body part, *see* ***Yates v. Bradley***, 396 S.W.2d 735, 738 (Mo. Ct. App. 1965), or to

- 22 -

a mental or psychological impairment. *See **Kerr v. Magic Chef, Inc.***, 793 S.W.2d 927, 929 (Tenn.1990); ***International Yarn Corp. v. Casson***, 541 S.W.2d 150, 152 (Tenn. 1976).

***Overstreet***, 4 S.W.3d at 715. As discussed in detail above, there is material evidence to support the jury's finding that the accident caused Mr. Malone to suffer a back injury and traumatic brain injury, both of which may constitute permanent injuries. However, ASF asserts that "both Dr. Rubin and Dr. Raimundi merely testified that traumatic brain injuries, like the injury Mr. Malone allegedly sustained, can either be temporary or permanent." ASF contends that none of Appellees' experts testified that Mr. Malone sustained a **permanent** injury from the collision. From our review of the testimony, we disagree.

Dr. Dalal testified that Mr. Malone's injuries would "interfere with Mr. Malone's ability to walk long distances and be on his feet all day." In Dr. Dalal's "Independent Medical Evaluation," which was made an exhibit to his deposition, he noted the following:

CHIEF MEDICAL COMPLAINT: The patient states he used to work prior to this injury and after this injury he has to apply for disability because he just could not do the kind of work he did before. His previous work involved taking care of a lot of supplies and deliveries. Now he is very emotional and suffers from anxiety. He is constantly scared. He is walking with a cane. He is complaining of loss of memory, loss of orientation and mental disturbance. He explains to me he has constant pain in his lower back which radiates down to the [] leg. He suffers from nightmares and he has trouble sleeping. He especially is afraid of traveling in a vehicle.
PAST MEDICAL HISTORY: Negative for any major medical problems.
MEDICATIONS: None.
PREVIOUS INJURY TO THE SAME PART OF THE BODY: No

\*\*\*

ACTIVITIES OF DAILY LIVING: He suffers from memory loss and panic attacks. He cannot sleep at night due to fear and anxiety. He has nightmares. He places a chair in the shower to bath[e]. He cannot complete activities of daily living due to pain and loss of functional mobility. He has to mentally prepare himself to get in a vehicle to go anywhere, especially if he has to travel on the interstate.
REVIEW OF MEDICAL RECORDS: MRI lumbar spine showed multilevel degenerative disc disease with acquired scoliosis and spinal stenosis. Small disc protrusion at L4-5. Review of psychological testing performed by Dr. Raimundi indicates that [s]he felt Mr. Malone did suffer from a neurocognitive disorder due to traumatic brain injury/concussion with behavioral disturbances.

GENERAL EXAMINATION: . . . patient walks with a limp on the left side. He uses a cane. . . .

PHYSICAI, EXAMINATION: Examination of the cervical spine shows moderate paraspinal muscle spasms. . . . Both upper extremities show mild weakness bilaterally. Lumbar spine examination shows severe tenderness in the lower lumbar spine. There is evidence of a left trochanteric bursitis and tenderness over the left greater sciatic foramina.[2] Straight leg raising test is positive on the left side and negative on the right side. Exam of both hips was normal.

X-RAYS: Radiographs of the lumbar spine views show severe multilevel degenerative disc disease.

DIAGNOSES:

1. Status post motor vehicle accident. The patient was hit by an 18-wheeler truck and now suffers from concussion, loss of memory, and sleeping difficulty.

2. The patient has pain in the lower back radiating down the left lower extremity which is called sciatica. No other abnormality was detected on the leg except for mild trochanteric bursitis.

3. He does have a cervical strain.

IMPAIRMENT RATING AND CRITERIA: Mr. Malone has impairment according to the AMA Guides to the Evaluation of Permanent Impairment Sixth Edition. Using Table 17-4 page 570 and 571 he qualifies for 12% impairment to the body as a whole. He has lumbar stenosis at a single level with or without AOMSI with medically documented findings, with or without surgery, and with documented signs of radiculopathy at the clinically appropriate level present at the time of examination. Impairment rating is assigned due to spinal stenosis with radiculopathy aggravated due to motor vehicle accident. He qualifies for 3% impairment to the body as a whole due to cervical strain. This is supported in Table 17-2 page 564. There is 3% impairment to the body as a whole for concussion syndrome with continued headaches. This is supported using Example 3-2 page 42. Using the Combined Values Table on page 604 the overall impairment equals 18% of the body as a whole.

From his examination of Mr. Malone and review of the medical records, Dr. Dalal clearly concluded that Mr. Malone suffers from some level of permanent injury resulting from injuries he sustained in the accident.

---

[2] Trochanteric Bursitis is inflammation of the bursa, i.e., fluid-filled sac, near the hip joint. When the bursa is inflamed, it often causes pain in the hip.

In her testimony, Dr. Raimundi described Mr. Malone's injuries as "drastic and severe," to-wit:

[M]y conclusions were that he did suffer a concussion; that he lost consciousness, and that there were some areas of specific changes after this injury, not only cognitively, but emotionally; that they were drastic and severe in taking that accident as the trigger.

Turning to Dr. Rubin's testimony, although he opined that additional medical treatment may provide some relief for Mr. Malone's back and leg issues, concerning Mr. Malone's brain injury, Dr. Rubin testified:

Q. Okay. Is there any other treatment or therapy that you would recommend for Mr. Malone going forward?
A. Regarding the head injury, no. Regarding his back, yes.

From Dr. Rubin's statements, a reasonable jury could infer that Mr. Malone's cognitive issues will not be cured with further treatment.

The foregoing medical testimony was corroborated by Mr. and Mrs. Malone's respective testimony that Mr. Malone's physical and cognitive symptoms have not improved since the accident. The Malones testified concerning Mr. Malone's inability to work inside or outside the home. Mrs. Malone and Ebony Malone testified concerning Mr. Malone's mood changes and separately described him as irritable and difficult. Ms. Marshall and Mr. Jimmerson also testified to changes in Mr. Malone's personality and described episodes of depression, isolation, and panic that they each witnessed. From the totality of the evidence, there is sufficient material evidence from which the jury could reasonably conclude that Mr. Malone sustained permanent injury in the accident.

## 2. Future Medical

The jury awarded $400,000 in future medical expenses. As this Court has explained:

In a negligence case, the plaintiff "may recover damages from the other person for all past, present, and prospective harm." *Henley v. Amacher*, No. M1999-02799-COA-R3-CV, 2002 WL 100402, at *13 (Tenn. Ct. App. Jan. 28, 2002). The damages for prospective harm include "the reasonable cost of the medical services that will probably be incurred because of the lingering effects of the injuries caused by the negligent person[,]" *id*.[, but] . . . "damages for future medical expenses may not be awarded when the damages are based on speculation or conjecture." *King v. Gen. Motors Corp.*, No. M2004-00616-COA-R3-CV, 2005 WL 3508016, at *6 (Tenn. Ct.

App. Dec. 22, 2005). In order to prevent an award of future medical expenses from being based upon speculation, a person seeking such an award must present evidence of the following:

> (1) that additional medical treatment is reasonably certain to be required in the future and (2) that will enable the trier-of-fact to reasonably estimate the cost of the expected treatment.

*Henley*, 2002 WL 100402, at \*13; *see also King*, 2005 WL 3508016, at \*6.

***Kirby v. Memphis Light, Gas & Water***, No. W2017-02390-COA-R3-CV, 2019 WL 1895862, at \*3 (Tenn. Ct. App. April 29, 2019).

We begin with the first element of proof—that additional treatment is reasonably certain to be required in the future. This component of a claim for future medical expenses requires proof "with some degree of certainty" that the plaintiff "will undergo future medical treatment for the injuries caused by the defendant's negligence." *Henley*, 2002 WL 100402, at \*14. The "reasonable certainty" standard does not require proof to an absolute certainty. *Id*. Rather, the plaintiff must prove "that he or she will, more probably than not, need these medical services in the future." *Id*.

Turning to the record, Dr. Rubin testified that Mr. Malone's injuries would require future medical treatment, to-wit:

Q. Is there any treatment or additional testing that you recommended for Mr. Malone?
A. Yes, we - because of the leg pain that it was going down the leg, we wanted to make sure there was no nerve root compromise. We recommended an EMG NCV study. And because of the cognitive issues and complaints, we recommended an MRI of the brain.
Q. Okay. And do you believe based on the problems Mr. Malone had when you saw him that he would need additional medical treatment in the future?
A. Yeah, I recommended some treatment for his back more invasive, seeing a pain doctor, maybe getting diagnostic, as well as therapeutic facet injections.
Q. And do you believe to a reasonable degree of medical certainty that Mr. Malone's condition necessitates pain management of some form?
A. Yes.
Q. And how long do you anticipate he would need that pain management?
A. It's unclear. I would have to see how he responds to treatment, so, you know, without even undergoing any treatment, I just don't know.
Q. Would you recommend additional neurological follow-up for Mr. Malone?

A. Yeah. Clearly, he's having some issues that could be medicated and treated better and he should be followed and treated.

Dr. Raimundi recommended a one-time neuropsychological evaluation, a one-time occupational therapy evaluation, a one-time speech therapy evaluation, a one-time psychological evaluation, a one-time neurological evaluation, and follow up neurological care.

Likewise, Dr. Dalal testified:

Q. In terms of future medical treatment, what would you expect Mr. Malone to require to treat his back injury and leg pain as he continues to age?
A. Well, if you look at my recommendation it states very clearly: The patient states that prior to auto accident he was doing fine. He was doing regular work. I strongly advised him to get an MRI of his cervical spine, which is the spine in the neck and an MRI of the lumbar spine at this point because when I saw him in [2018], and I had the last MRI in [2015]. I don't have an MRI of his lumbar spine again. . . . [I]f I was his treating doctor I would get an MRI done. I would take a look at that disc and see . . . if he needs to have a surgical intervention or an epidural block . . . .
Q. Okay. So I understand that you've recommended at least one more lumbar MRI. Do you believe it's more likely than not that he would need additional repeat MRIs of his lumbar spine?
A. He may. He may. And not only that. It's like I need an MRI. But MRI is not a treatment. MRI is an investigation. . . .
Q. Would you recommend any medication for Mr. Malone in the future?
A. Well, as needed. He may need what's called gabapentin, which is a neurologic pain medicine which you use it to calm the nerves down when you have pressure. . . .
Q. Would Mr. Malone benefit from physical therapy?
A. Yes, if required. Yes, of course.
Q. What about occupational therapy; would he benefit there from that as well?
A Yes, if required and it could be beneficial like occupational and physical therapy because you really have to help people get back to their preinjury status. And as a doctor I can treat the anatomy, but you need occupational therapy and physical therapy to actually get back to the normal life.
Q. Would Mr. Malone also benefit by evaluation by a neurologist for his lumbar spine problems?
A. Neurologists and a neurosurgeon. Neurologists more for the headaches and concussion and memory and all of that fall in neurology. Anxiety and all that falls within neurology. . . . There are a lot of newer medications in neurology. . . but neurology evaluation for all those cognitive issues. But

- 27 -

neurosurgical evaluation for the disc and everything else.

Q. Given the anxiety, fear, and nightmares and things that Mr. Malone reported to you, would it be reasonable for him to have an evaluation by a psychologist to determine what psychological treatment, if any, he may need?

A. Yes; Whatever the psychologist decides how to make his anxiety issue better, I cannot comment on that. That's not my specialty. But whatever they think he needs, he needs.

From the foregoing medical testimony, there is material evidence to support the jury's finding that it is reasonably certain that Mr. Malone's injuries will require additional treatment in the future.

To corroborate and expand on Dr. Rubin, Dr. Raimundi, and Dr. Dalal's respective testimony concerning Mr. Malone's need for future medical care, and to satisfy the second prong of the required proof—the estimated cost the future medical expenses—the Malones offered testimony from Mr. Steven Zimmerman. Mr. Zimmerman holds a master's degree in physical education, with a focus on athletic training. He is a registered nurse with certification in the field of life care planning. Mr. Zimmerman explained that a life care planner "puts together the medical needs and the costs associated with those needs for a patient" with life-altering injuries. As explained by Mr. Zimmerman, the purpose of the life care plan is "[t]o determine what [the injured individual is] going to need for the rest of [his or her life] and the cost of that." Mr. Zimmerman was admitted as an expert without objection from ASF:

MR. LEWELLYN: And at this time[,] I'd like to tender Mr. Zimmerman as an expert in the field of life care planning.
MS. KEEN: No objection, Your Honor.
THE COURT: He'll be admitted.

In preparing a life care plan for Mr. Malone, Mr. Zimmerman testified that he reviewed all of Mr. Malone's medical records and visited the Malones' home to obtain information about Mr. Malone's limitations within the home environment. He also reviewed and relied on Dr. Raimundi, Dr. Rubin, and Dr. Dalal's recommendations concerning future medical treatment and the frequency thereof. In addition, as an expert witness, Mr. Zimmerman provided some additional recommendations for treatment. After consulting with local (i.e., Memphis) medical providers to obtain the reasonable costs for the recommended future medical treatment, Mr. Zimmerman assessed the future medical expenses associated with the following treatments: neuropsychological examination, physical therapy evaluations, physical therapy, an occupational therapy evaluation, a speech therapy evaluation, a functional capacity evaluation, a psychological evaluation, a neuropsychiatry evaluation, primary care visits, neurology evaluations and follow up appointments, pain management, lumbar facet injections, lumbar MRIs, housekeeping

services, lawn work, antidepressants, muscle relaxers, and anti-inflammatories.

In his testimony, Mr. Zimmerman cited Dr. Raimundi's recommendations for a one-time neuropsychological evaluation, a one-time occupational therapy evaluation, a one-time speech therapy evaluation, a one-time psychological evaluation, a one-time neurological evaluation, and follow up neurological care. He cited Dr. Rubin's recommendations for a one-time pain management evaluation, follow-up pain management care, three lumbar facet injections, and antidepressants, muscle relaxers, and anti-inflammatories. Concerning the recommended medications, Mr. Zimmerman explained that he relied on Dr. Rubin's recommendations concerning the frequency and duration of the medication. Based on Dr. Dalal's recommendation for a lumbar MRI, Mr. Zimmerman opined that he would expect two lumbar MRIs to be necessary over the remainder of Mr. Malone's life expectancy. In addition, Mr. Zimmerman recommended annual physical therapy evaluations and physical therapy, and testified that making these recommendations was within the scope of his practice as a registered nurse and athletic trainer. Mr. Zimmerman also made recommendations for housekeeping and lawn care services based on Mr. Malone's physical limitations and the information he obtained from the home visit. However, Mr. Zimmerman noted that his life care plan was conservative in that it did not include costs for occupational therapy, speech therapy, or psychological counseling because the necessity and frequency of those treatments could not be determined at the time of the hearing.

In its appellate brief, ASF asserts that Mr. Zimmerman is "a person with very little medical training and by no means a medical expert, [who] based his projection of the frequency of Mr. Malone's future medical treatment on his own recommendations." Yet, at trial, ASF did not object to Mr. Zimmerman being called as an expert witness. Furthermore, on appeal, ASF asserts that Mr. Zimmerman's testimony is "[f]ar from being expert testimony 'made with a reasonable degree of medical certainty,' [citation omitted], [and] is speculative, is supported only by lay opinion, and the jury's award of damages for future medical therefore runs contrary to Tennessee law." We note that ASF's counsel failed to contemporaneously object to Mr. Zimmerman's testimony during trial and also failed to identify any objectionable portion of Mr. Zimmerman's testimony in the motion for new trial. Thus, any objection to Mr. Zimmerman's testimony is waived. ***Jernigan v. Paasche***, No. M2020-00673-COA-R3-CV, 2021 WL 2529566, at \*11 (Tenn. Ct. App. June 21, 2021) (citing ***Goss v. Hutchins***, 751 S.W.2d 821, 827 (Tenn. 1988)).

In addition to Mr. Zimmerman, the Malones called Robert Vance, Jr., a forensic CPA and economist, and business valuation analyst, to calculate the present-day value of Mr. Malone's future medical expenses. Using Mr. Zimmerman's life care plan and adjusting for inflation, Mr. Vance testified that the future medical expenses totaled $469,186. ASF did not object to Mr. Vance's testimony regarding the future medical expenses. Therefore, based on the recommendations of Dr. Rubin, Dr. Ramundi, and Dr. Dalal, and the unopposed testimony of Messrs. Zimmerman and Vance, there is sufficient

proof to establish both the need for future medical treatment and the reasonable costs thereof. The jury's award of $400,000 in future medical expenses was within the range of reasonableness and was supported by material evidence.

### 3. Loss of Earning Capacity

The jury awarded $375,000 for lost earning capacity. As set out in context above, the jury heard testimony from Ebony Malone, Eric Jimmerson, and Teresa Marshall that Mr. Malone had no difficulty walking prior to the subject collision. These witnesses also testified that, prior to the accident, Mr. Malone suffered no cognitive impairment that would have precluded his ability to work. There is no dispute that Mr. Malone was both physically and mentally capable of working prior to the accident. Mrs. Malone testified that Mr. Malone worked fifty-to-sixty hours per week in the warehouse at Jabil Global Services, Inc., until July 1, 2015. Before he was employed by Jabil, where he was able to get consistent overtime, the testimony indicates that Mr. Malone worked up to two jobs simultaneously. After Mr. Malone left Jabil on July 1, 2015, he began to actively seek other employment. By August 2015, Mr. Malone had secured a general warehouse associate position at Sears Logistic Services, LLC, where he would have earned approximately $14 per hour starting September 14, 2015. In fact, at the time of the accident, Mr. Malone was returning home from an interview for a second job. As Dr. Rubin testified:

> Q. Okay. Did Mr. Malone tell you whether he was working when you evaluated him?
> A. Yeah, he, prior to the accident, I think, had two jobs that he was working at. And part of his issue with depression and anxiety was the fact that he has not been able to go back to work. So it's been a real thorn in his side not being able to work.
> Q. Okay. Did - based on your meeting with Mr. Malone and your examination of him and taking his history, did he strike you as the type of person who would enjoy not being able to work?
>
> ***
>
> A. No, he struck me as somebody who was hard working. He was a marine, took pride in his job. In fact, I think the accident occurred when he was going on an interview for another job and so, no, I don't think this is something that he wanted to have happen.

In *Oglesby v. Riggins*, this Court explained that

> [w]hen a physical impairment is obscure and a plaintiff is attempting to recover damages for a loss of earning capacity, "there must be competent

medical testimony that the physical condition suffered by the plaintiff, and which was proximately caused by the occurrence in suit, is a substantial factor in impairing the party's ability to earn."

*Oglesby v. Riggins*, No. W2010-01470-COA-R3-CV, 2011 WL 915583, at *6 (Tenn. Ct. App. Mar. 17, 2011) (citation omitted).

As set out in 29 Am. Jur. 3d Proof of Lost Earning Capacity § 6 (1995):

Assuming the plaintiff has established the foundation case for liability against the tortfeasor, the elements of proof necessary to establish the claim for loss of earning capacity as an element of damages are as follows:

1. Proof of the existence of some earning capacity—either actual or potential—prior to the injury;
2. Proof that this earning capacity has been lost or diminished;
3. Proof that the cause of the lost or diminished earning capacity is proximately caused by the injury; and
4. Proof of the dollar amount of the loss.

*Id*. (footnotes omitted).

The question of loss of earning capacity, both past and future was discussed by this Court in **Overstreet**, where we concluded that the plaintiff's claim for diminished earning capacity was not speculative because she was employed as a registered nurse and had demonstrated the ability to advance in the nursing profession. In so ruling, we noted that:

The party seeking damages has the burden of proving them. . . . In tort cases, the proof of damages need not be exact or mathematically precise. . . . Rather, the proof must be as certain as the nature of the case permits and must enable the trier of fact to make a fair and reasonable assessment of the damages. . . .

Loss or impairment of future earning capacity is an element of damages in a personal injury action. . . . Earning capacity refers not to actual earnings, but rather to the earnings that a person is capable of making. . . .

The extent of an injured person's loss of earning capacity is generally arrived at by comparing what the person would have been capable of earning but for the injury with what the person is capable of earning after the injury. . . . If the injury is permanent this amount should be multiplied by the injured person's work life expectancy, and the result should be discounted to its present value . . . . [fn. 1 states that "[d]amages for impairment of earning capacity may be awarded for either permanent or temporary impairments. . . .]

- 31 -

The injured party has the burden of proving his or her impairment of earning capacity damages. . . . In order to recover these damages, the injured person must first prove with reasonable certainty that the injury has or will impair his or her earning capacity. . . . Then, the injured party must introduce evidence concerning the extent of the impairment of his or her earning capacity.

The proof concerning impairment of earning capacity is, to some extent, speculative and imprecise. . . . However, this imprecision is not grounds for excluding the evidence. . . .

The courts have found competent and admissible any evidence which tends to prove the injured person's present earning capacity and the probability of its increase or decrease in the future. . . . Thus, the courts have routinely admitted evidence concerning numerous factors, including the injured person's age, health, intelligence, capacity and ability to work, experience, training, record of employment, and future avenues of employment. . . .

*Overstreet*, 4 S.W.3d, at 703-704.

Furthermore, as noted in 29 Am. Jur. 3d Proof of Lost Earning Capacity § 5 (1995), fact finders must distinguish between impaired physical capacity and impaired earning capacity. They are not necessarily the same:

Proof of impaired physical ability is not always equivalent and therefore not always sufficient to prove impaired capacity to earn. Depending upon an individual's skill, education, training or experience, a severe physical disability may make no difference at all to one individual's capacity to earn while an otherwise trivial injury may make a significant difference to another. . . .

A careful analysis of the circumstances of each case is necessary. [One] cannot assume that significant physical injuries alone will be sufficient to establish an entitlement to damages for loss of earning capacity, nor should [one] overlook this element in cases of what may otherwise appear to be trivial or minor injuries.

*Id.*  With the foregoing in mind, we turn to the record.

The Malones called Dr. David Strauser, a vocational expert and professor at the University of Illinois Urbana-Champaign in the Department of Kinesiology & Community Health.  Dr. Strauser holds a Ph.D. in rehabilitation psychology, which he explained "is the study of psychology as it relates to disability and Chronic health, adjustment to Chronic health and disability focusing on both psychosocial issues as well as career and vocational issues."  Importantly, ASF did not object to Dr. Strauser being called as an expert in

rehabilitation psychology, to-wit:

> MR. LEWELLYN: At this time I'd also like to tender Mr. Strauser as an expert in the field of rehabilitation psychology.
> MS. KEEN: No objection.
> THE COURT: He'll be admitted.

Dr. Strauser met with Mr. Malone and also reviewed his medical records to perform an assessment of his pre-and-post-injury earning capacity. Based on the educational and work history provided by Mr. Malone and the testing performed by Dr. Strauser, Dr. Strauser testified that Mr. Malone had a capacity to earn between $34,000 and $40,000 a year prior to the subject collision. Dr. Strauser explained that these figures were based on Department of Labor figures for food service and warehouse work, which typically pay between $10.00 and $14.00 per hour. He further testified that his calculation of Mr. Malone's pre-injury earning capacity was based on the assumption of a sixty-hour work week because Mr. Malone had demonstrated the ability to work two jobs for most of his adult life and because Mr. Malone had worked approximately fifty-to-sixty hours a week during his ten-year employment with Jabil. Dr. Strauser also testified that Mr. Malone sustained a "complete loss of earning capacity" following the accident. Dr. Strauser explained:

> Q. How did you reach that conclusion?
> A. Well, when you look at what his—needing a cane to ambulate, that's not going to transfer real well into food service. It's not going to transfer real well into warehouse work. It is not going to transfer real well into manual labor type positions that he did. And then, in addition, the psychological overlay of depression, that is going to impact a person's functioning both physically and mentally. It's going to compound that problem where he would not be able to meet, on a sustained level, the demands of work as it's typically performed.
>
> ***
>
> Q. So is it your opinion that Mr. Malone is completely vocationally disabled based on his physical injuries and his depression alone?
> A. Yes.
> Q. Okay. And what is your opinion about Mr. Malone's loss of earning capacity?
> A. As a result of his [] current state at the time that I evaluated him, he is unable to participate in the labor market, therefore, has a complete loss of earning capacity.

Dr. Strauser opined that Mr. Malone's loss of earnings "would range somewhere between $377,520 and $446,160." Dr. Strauser arrived at this range by applying the $34,000 to $40,000 annual earning capacity, *supra*, from "age 55 [i.e., Mr. Malone's age at the time of the accident] to age 66, which is the Social Security retirement age."

In addition to Dr. Strauser, the Malones also elicited testimony from Mr. Vance on Mr. Malone's future loss of earning capacity. Like Dr. Strauser, Mr. Vance predicated his opinion on total disability. Mr. Vance began his analysis with a salary of $34,320 to $40,560, which was comparable to the range used by Dr. Strauser, i.e., $34,000 to $40,000. Using this range, Mr. Vance testified that the present-day value of Mr. Malone's loss of earning capacity was between $385,000 and $455,000. Unlike Dr. Strauser, Mr. Vance also included calculations for the present-day value of Mr. Malone's loss of fringe benefits. Mr. Vance explained that, in view of the types of jobs Mr. Malone worked, which offered "the lowest amount of fringe benefits," his calculations included only "legally required benefits," i.e., "social security, Medicare, workers' compensation insurance, and unemployment insurance." Mr. Vance's calculation omitted other fringe benefits "such as health insurance, and life insurance, and disability, and . . . supplemental pay, paid leave, vacations . . . ." Using data from the Bureau of Labor Statistics, Mr. Vance calculated the present-day value of Mr. Malone's lost fringe benefits at $42,000 to $50,000. Although ASF's counsel cross-examined Dr. Strauser and Mr. Vance, ASF did not tender its own expert on the loss of income analysis. So, from the evidence, a reasonable jury could have awarded Mr. Malone $377,520 to $446,160 under Dr. Strauser's calculations, or could have awarded Mr. Malone $427,000 to $505,000 (inclusive of lost fringe benefits) based on Mr. Vance's calculations. The jury awarded $375,000, which was slightly lower than either expert's range and, thus, well within the range of reasonableness based on the material evidence adduced at trial.

### 4. Loss of Consortium

In its brief, ASF argues that the jury's award for loss of consortium should be invalidated because Mrs. Malone's loss of consortium claim appeared on the jury verdict form as two blanks: (1) "Loss of Services of Julius Tyrone Malone," for which the jury awarded $60,000; and (2) "Loss of Companionship and Acts of Love and Affection," for which the jury awarded $75,000. As noted above, ASF neither objected to the jury verdict form, nor raised the issue in its motion for new trial. As such, the question of whether the jury's awards for loss of services and loss of companionship are duplicative are waived. Regardless of the waiver, and without discussing the question of whether the jury's verdict was duplicative, we note that the trial court's application of the statutory cap on non-economic damages, which reduced the jury's verdict by $990,000, would have cured any duplication of the loss of consortium damages.

## V. Conclusion

Because there is material evidence to support the jury's verdict, we conclude that it is not the result of the jury's passion or prejudice. We affirm the trial court's judgment on the jury verdict and remand the case for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellant, ASF Intermodal, LLC, for which execution may issue if necessary.

s/ Kenny Armstrong
KENNY ARMSTRONG, JUDGE